# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CELLULAR TECHNICAL SERVICES      :
COMPANY, INC., et al.,           :
                                 :
          Plaintiffs,            :
                                 :
v.                               :      No.  3:07cv1682 (MRK)
                                 :
TRUEPOSITION, INC., et al.,      :
                                 :
          Defendants.            :

## MEMORANDUM OF DECISION

       Plaintiffs in this case are the former owners of a telecommunications company called KSI,

Inc. ("KSI").[1] Defendants include TruePosition, Inc. ("TruePosition") and Liberty TP Management,

Inc. ("Liberty"), both of which are subsidiaries of Defendant Liberty Media Corporation ("Liberty

Media"), as well as Mark Carleton, J. David Flemming, Timothy D. Lenneman, John Orr, and

Christopher Shean (collectively "Defendants").  The individual Defendants are high-level officers

of TruePosition and Liberty and/or Liberty Media.  In mid-2000, Plaintiffs became minority

---

[1] Plaintiffs are as follows: Joseph R. Mazzarella, individually and as administrative agent on behalf of the Plaintiffs as former stockholders of KSI, Inc.; Cellular Technical Services Co., Inc.; Business Equities LP; Cordoboa Capital III, LP; Cypress VI Partners; Mar Vista Capital Ltd.; PENSCO Pension Svcs., Inc.; Zafa II LLC; Mark Hatten; Colin McWay; Gregory P. Norman; Douglas K. Adler; Ben B. Hirsh Trust; Richard H. Chase, Jr., George R. Collins and Frances K. Collins; Edward R. Downe, Jr.; Linda L. Gomez; George L. Hanseth and Valerie Hanseth; Hatten Family Limited Partnership; James M. Hulbert Associates, Inc., Profit Sharing Plan; Chris P. Janelli; William Leimkuhler; Karl and Deborah Matthies Living Trust; Stephen Katz; David P. Kleeman; Michael R. Lauretano; Lincoln Trust Co.; Walter A. Marlowe; Palmer D. Marrin; E. Merritt and Maggie Fay McDonough; Potter Family Trust; Aaron M. Roland; Doreen Segal; Theo B. Bean Family Parternship, LP; Trust ULWT of Bertha Nelson; Yorkin Family Partnership, LP; and Cynthia J. White.

stockholders in TruePosition after it acquired KSI.  At the time of the acquisition, Plaintiffs' stock was valued at approximately $ 19 per share.

In this action, Plaintiffs sue Defendants in a seven-count complaint alleging that Defendants engaged in a series of fraudulent, deceitful, and interested transactions over the course of five years that ultimately diluted Plaintiffs' interest in TruePosition and enabled a short-form merger of TruePosition and Liberty TP Acquisition, Inc. in July 2007 that valued Plaintiffs' stock at a mere $3.51 per share.  Plaintiffs seek over $ 80 million in damages under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the Connecticut Uniform Securities Act, Conn. Gen. Stat. §§ 36b-4 and 36b-29.  Plaintiffs also assert common law claims of breach of fiduciary duty, fraud, conspiracy to defraud, and unjust enrichment.

After Plaintiffs filed an amended complaint, Defendants moved to dismiss it, raising a number of statute of limitations defenses and challenging Plaintiffs' ability to state a *prima facie* case for each of their various claims.  During an on-the-record telephone conference with the parties on January 23, 2008, the Court suggested that Plaintiffs take one last chance to amend their complaint to address the claimed defects pointed out in Defendants' original motion to dismiss.  The Court made clear during the telephonic conference that Plaintiffs had to utilize this option to respond as fully as they could to Defendants' motion, alleging as many facts as possible consistent with Rule 11 of the *Federal Rules of Civil Procedure*.  To that end, Plaintiffs filed a Second Amended Complaint in lieu of a brief in opposition to Defendants' original motion to dismiss.  Defendants then moved to dismiss the Second Amended Complaint, incorporating the brief from their previous motion and focusing their renewed motion on the changes in the complaint.  For the reasons that

2

follow, the Court GRANTS Defendants' Motion to Dismiss the Second Amended Complaint [doc.# 46].

## I.   Introduction

As this Court has stated before, "in summarizing the facts, the Court 'accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of' [Plaintiffs]." *OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 497 (D. Conn. 2007) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).  Although the Court construes the factual allegations in the light most favorable to Plaintiffs, the Court is not required to accept the legal conclusions asserted in Plaintiffs' Second Amended Complaint.  *See S.E.C. v. Simpson Capital Mgmt., Inc.*, 586 F. Supp.2d 196, 199 (S.D.N.Y. 2008) (citing *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)).

Furthermore, on a motion under Rule 12(b) of the *Federal Rules of Civil Procedure*, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations and quotation marks omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007).  A document is integral to the complaint "where the complaint relies heavily upon its terms and effect."  *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  As the Second Circuit has explained, "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere

3

notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007).

Therefore, in its description of the facts and assessment of Plaintiffs' complaint, the Court relies not only on Plaintiffs' Second Amended Complaint [doc. # 42], but also on the "Supplemental Information Statement for Annual Meeting of Stockholders to Be Held December 18, 2002" issued by TruePosition's Board of Directors to all of its stockholders, *see* Decl. of Richard Harper [doc. # 48] Ex. 1A (the "2002 Information Statement"), and "Re: Minority Shareholder Representative Comments for Annual Meeting of Stockholders of TruePosition to Be Held December 18, 2002," *see id.* Ex. 3 (the "Minority Shareholder Comments"), both of which Plaintiffs refer to in their Second Amended Complaint. *See, e.g.,* Second Am. Compl. [doc. # 42] ¶¶ 24-27. Although Plaintiffs did not attach the Information Statement and Minority Shareholder Comments to their Second Amended Complaint, the Court finds that it may consider these documents because: (1) they are "integral" to the complaint; (2) "no dispute exists regarding the authenticity or accuracy" of the documents; and (3) "no material disputed issues of fact [exist] regarding the relevance" of the documents. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *OBG Technical Servs., Inc.*, 503 F. Supp. 2d at 498.

As noted previously, this case involves a series of transactions involving Plaintiffs and Defendants that began in 2000 and ultimately ended in a short-form merger in 2007 of TruePosition and Liberty TP Acquisition, Inc., a subsidiary of Liberty Media, with TruePosition as the surviving corporation. In mid-2000, TruePosition acquired KSI in a stock deal under which KSI's owners received ten percent (10%) of the outstanding common stock of TruePosition, which was estimated at a value of $ 40 million, or approximately $ 19 per share. According to Plaintiffs, the acquisition

4

of KSI would enable TruePosition to "bring[] together two land based location technologies" and realize the "tremendous benefit of combining the two patents which gave TruePosition an effective monopoly on the means for terrestrial based wireless location." *See* Second Am. Compl. [doc. # 42] ¶ 21.

During the negotiations leading to the acquisition of KSI, TruePosition disclosed that an unsecured inter-company indebtedness of $ 60 million existed between TruePosition (as borrower) and Liberty Media (as lender). In late 2002, approximately two years after TruePosition's acquisition of KSI, TruePosition disclosed its intent to convert this unsecured debt into a secured, senior position, convertible indebtedness to Liberty Media with an eleven percent (11%) per year quarterly compounded interest rate through the issuance of Series A preferred stock (the "2002 Interested Transaction"). However, before undertaking that transaction, Defendants held a TruePosition shareholder meeting in late 2002. In connection with that meeting, TruePosition's Board of Directors issued the 2002 Information Statement. According to Plaintiffs, the 2002 Information Statement misrepresented that the purpose of the 2002 Interested Transaction was to secure funding for TruePosition's continued operations as a result of its "purported inability to obtain third party financing on commercially reasonable terms, if at all." *Id.* ¶ 24. However, as Plaintiffs concede, Defendants acknowledged to Plaintiffs at the time that Defendants had made "absolutely no effort to seek out any independent or alternative financing" before recommending the 2002 Interested Transaction. *Id.*

Plaintiffs further claim that Defendants failed to obtain a fairness opinion for the 2002 Interested Transaction because of the interested nature of the transaction, which gave a "substantial benefit to Liberty Media for no consideration, was self serving, and was approved by a board

comprised of Liberty Media insiders." *Id.*  Plaintiffs allege that TruePosition failed to seek out a fairness opinion because "[it] knew that the Interested Transaction could not withstand scrutiny and because it knew that its proffered reason for the Interested Transaction (that it could not obtain third party financing on commercially reasonable terms, if at all) could not be justified, and its fraudulent scheme would be exposed and thus thwarted." *Id.*  However, as Plaintiffs' Minority Shareholder Comments and Second Amended Complaint make clear, Plaintiffs were well aware in December 2002 that Defendants had not sought any independent, alternative financing and that Defendants had not obtained a fairness opinion.  Plaintiffs knew all of this at the time as a result of a their direct inquiry of Defendants prior to the shareholder meeting in 2002.  *See id.* ¶¶ 24-25; Harper Decl. [doc. # 48] Ex. 3 ("Minority Shareholder Comments").

According to Plaintiffs, Defendants also obtained a defective valuation in furtherance of their alleged scheme.  However, Plaintiffs challenged the valuation in the Minority Shareholder Comments submitted to Defendants prior to approval of the 2002 Interested Transaction.  *See* Harper Decl. [doc. # 48] Ex. 3.  Plaintiffs therefore were well aware of any defects in that valuation.

Finally, Plaintiffs claim that Defendants never revealed the real reason for the 2002 Interested Transaction, which Plaintiffs assert is now apparent:  "it was part of the scheme to place Defendants in a position to divest the Stockholders of their interest in TruePosition and then to affect and realize the benefit of their fraudulent and deceitful conduct" via a short form merger five years later in 2007.  *See* Second Am. Compl. [doc. # 42] ¶ 25.  However, Plaintiffs concede that the 2002 Information Statement contained a dilution analysis showing that TruePosition's stockholders would be diluted if Liberty Media exchanged its Series A preferred stock for Series A notes and then converted those notes to common stock, as permitted by the instruments in question.  *See* Harper Decl. [doc. # 48]

6

Ex. 1A; *id.* Ex. 4.  The dilution analysis showed the capital structure of TruePosition after its acquisition of KSI as consisting of ten percent (10%) ownership by Plaintiffs, approximately seventy-nine percent (79.02%) ownership by Liberty Media, and approximately eleven percent (10.98%) ownership outstanding as a result of shares reserved for options.  *See id.* Ex. 4.  The dilution analysis also demonstrated that assuming the issuance of Series A preferred stock on December 19, 2002, the exchange of the preferred stock for Series A notes, and the conversion of those notes to common stock on the same date, Plaintiffs' ownership of True Position would decrease to 6.73% and Liberty Media's ownership of True Position would increase to 87.20%.  *See id.*  If TruePosition received an additional advance from Liberty Media on December 18, 2002, and the same exchange and conversion took place on December 19, 2002, the dilution analysis showed that Plaintiffs' ownership would decrease to 6.11% and Liberty Media's ownership would rise to 88.37%.  *See id.*  The remaining ownership interest was comprised of options and outstanding common stock.  *See id.*  Under Delaware law, Defendants could effectuate a short-form merger without Plaintiffs' approval upon securing ninety percent (90%) of TruePosition's outstanding shares.  *See* 8 Del. C. § 253.

On the basis of the objections they raised in the Minority Shareholder Comments, Plaintiffs voted to reject the 2002 Interested Transaction, specifically objecting to "the fact that it was a self serving transaction with no fairness opinion and that absolutely no efforts were made to obtain third party financing."  Second Am. Compl. [doc. # 42] ¶ 27.  The specific objections that Plaintiffs voiced in 2002 included, but were not limited to, the following:

(1)     TruePosition "may have failed to adequately establish that the terms and conditions of the subject transaction are fair, and/or otherwise represent fair-market, commercially available terms";

7

(2)     TruePosition "may have failed to adequately demonstrate that reasonable efforts were undertaken to solicit and secure financing on terms and conditions more favorable than those proposed from other third party financing sources";

(3)     TruePosition "may have failed to adequately demonstrate that the true fair market value of [Liberty] as adopted in the Proxy Materials is correct";

(4)     TruePosition had lacked an independent, third party fairness opinion;

(5)     TruePosition had premised the transaction on a defective valuation;

(6)     TruePosition had "failed to demonstrate that there is any new consideration or value to be received by [Liberty] in the exchange for the issuance of new securities for pre-existing indebtedness that carries substantially more favorable terms";

(7)     TruePosition's Board of Directors had actual or potential conflicts with Liberty Media, which was both the Majority Shareholder and the holder of the unsecured indebtedness;

(8)     TruePosition had failed to "timely renegotiate the terms of the indebtedness when [Liberty's] value was significantly higher";

(9)     TruePosition had failed to conduct annual shareholder meetings to the possible detriment of minority shareholders;

(10)    TruePosition "may have failed to consider alternative means to maximizing shareholder value rather than continuing to capitalize [TruePosition] on terms and conditions offered by Liberty Media"; and

(11)    TruePosition's Board of Directors had lacked independent, uninterested directors.

Harper Decl. [doc. # 48] Ex. 3 ("Minority Shareholder Comments").

Although they acknowledge that their votes were not necessary to approve the 2002 Interested Transaction, Plaintiffs allege that Defendants improperly approved the transaction despite their specific, written objections that characterized the transaction as one that "does not appear to be in the best interests of all the shareholders of [TruePosition], and, in particular, appears to have a

detrimental and clearly injurious effect on the interests of the Minority Shareholders." *Id.* In fact, Plaintiffs asserted in 2002 that any approval of the transaction by TruePosition's Board of Directors "may be violative of its fiduciary duties to the shareholders of the Corporation." *Id.* Despite "preserv[ing] the rights and claims of those Minority Shareholders who object to the proposed transaction, and . . . all such other rights . . . and remedies to which they may avail themselves, whether or not the basis for the same is stated herein," Plaintiffs did not seek to enjoin or otherwise stop the 2002 Interested Transaction from occurring.

According to Plaintiffs, Defendants took actions following the 2002 Interested Transaction to further their alleged fraudulent scheme. In particular, Plaintiffs allege that in the period following the 2002 Interested Transaction, TruePosition accumulated more than $100 million through its business operations, and that, in 2004, TruePosition secured $42 million in a settlement agreement. Plaintiffs assert that despite these large amounts of capital, Defendants allowed the TruePosition-Liberty Media inter-company indebtedness to accrue at a rate of eleven percent (11%), rather than reducing the debt or refinancing it at a lower interest rate in light of the fact that market interest rates were at "historic lows." *See* Second Am. Compl. [doc. # 42] ¶ 29. In addition, Plaintiffs claim that Defendants prohibited Plaintiffs from discovering the true value of TruePosition by barring Plaintiffs' attendance at board meetings and allowing only Plaintiffs' representative – who Plaintiffs were well-aware was subject to a confidentiality agreement – to attend the meetings. Lastly, Plaintiffs say that from 2004 onward, Defendants failed to disclose the status of the convertible indebtedness as well as the degree to which Plaintiffs' interest in TruePosition would be diluted if Liberty Media exercised its right to convert any portion of its preferred stock to common stock.

In about July 2007, Liberty Media converted a small portion of its convertible debt and thereby secured the requisite ninety percent (90%) ownership interest necessary to effectuate a short-form merger under Delaware law.[2]   According to Plaintiffs, Defendants failed to articulate a legitimate business purpose for the short-form merger.  Instead, Plaintiffs contend that the merger was "utilized as an instrumentality of Defendants' fraudulent scheme."  *Id.* ¶ 33.  On July 19, 2007, Defendants merged Liberty TP Acquisition, Inc. with TruePosition, thus divesting Plaintiffs of their shares and leaving them with no interest in TruePosition.  Under the merger, TruePosition became a subsidiary of Liberty, which in turn, is a subsidiary of Liberty Media.  On July 27, 2007, Defendants notified Plaintiffs of their completion of the short-form merger and the availability of appraisal rights.  At the time the notice was issued, Defendants estimated the value of Plaintiffs' stock to be $ 3.51 per share.  On August 15, 2007, Plaintiffs provided TruePosition with notice of their demand for appraisal rights under Delaware law.  On August 31, 2007, TruePosition filed a Petition for Appraisal in the Delaware Chancery Court, and Plaintiffs soon followed with their own appraisal action in Delaware state court.

Plaintiffs commenced this lawsuit in November 2007.  In April 2008, Defendants moved to dismiss Plaintiffs' Second Amended Complaint.  *See* Mot. to Dismiss Second Am. Compl. [doc. # 46].  With respect to Plaintiffs' federal law claims, Defendants argue that the Second Amended Complaint does not allege actionable fraud, causation or reliance or scienter; and does not state a claim for control person liability.  Defendants also argue that the federal claims are time-barred.

---

[2]   It is unclear from the pleadings how Liberty Media acquired the additional 1.63% ownership interest above the 88.37% ownership interest reflected in the dilution analysis in order to attain the 90% ownership interest in TruePosition that was necessary to effectuate the short form merger.  However, the parties do not dispute that it attained 90% ownership as a result of the debt conversion.

10

Defendants also urge the Court to decline supplemental jurisdiction over Plaintiffs' state law claims.[3] However, even if the Court did exercise jurisdiction over the state-law claims, Defendants contend that Plaintiffs' causes of action are time-barred and moreover, that Plaintiffs fail to state a claim for Connecticut securities fraud, for common law fraud, or for conspiracy to defraud.    Moreover, Defendants argue that Plaintiffs' remedies are limited to their pending appraisal action in Delaware. *See id.*

## II.    Federal Claims

In their Second Amended Complaint, Plaintiffs assert violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities, statutory language that makes clear that "claim[s] of fraud and fiduciary breach" asserted under Rule 10b-5 survive "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of [§ 10(b)]." *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 473-74 (1977), 15 U.S.C. § 78j(b).[4]  The Supreme Court has

---

[3]  Although Plaintiffs' Second Amended Complaint alleges diversity jurisdiction, Plaintiffs withdrew this allegation during an on-the-record telephone conference dated February 5, 2009. *See* [doc. # 83]; *see also* Notice of Citizenship of Plaintiffs [doc. # 81] ("[C]omplete diversity of citizenship does not exist as was originally determined.").  Diversity did not exist on the date this action was filed.  Therefore, the only jurisdictional basis for Plaintiffs' state law claims is supplemental jurisdiction under 28 U.S.C. § 1367.

[4]  Rule 10b-5 further provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

instructed that while "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices," § 10(b) generally does not apply to "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *See Santa Fe*, 430 U.S. at 477.

To succeed on a claim brought under § 10(b), Plaintiffs must plead and prove "(1) a material misrepresentation or omission by [Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  In other words, Plaintiffs must establish that Defendants "in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that [Plaintiffs'] reliance on [Defendants'] action caused injury to [Plaintiffs]." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 2009 129911, at *4 (2d Cir. 2009) (quotation marks omitted).

Defendants contend that Plaintiffs' federal securities action is barred by the applicable statute of limitations and that the Second Amended Complaint does not adequately state a claim under

---

       (a) To employ any device, scheme, or artifice to defraud,

       (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

       (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

§ 10(b) and Rule 10b-5.  Moreover, according to Defendants, because Plaintiffs have failed to state

a primary violation of federal securities law, Plaintiffs' control person liability claim under § 20(a)

also fails.

### A.

Both parties agree that a private right of action under § 10(b) can be brought no later than the

earlier of (1) two years after discovery of the facts constituting the violation; or (2) five years after

such violation.  *See* 28 U.S.C. § 1658(b).  As the Second Circuit has stated, "[t]he limitations period

begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or

notice of the facts, which in the exercise of reasonable diligence, would have led to actual

knowledge."  *Lentell v. Merill Lynch & Co., Inc.*, 396 F.3d 161, 167 (2d Cir. 2005) (quotation marks

omitted).  "Discovery of facts for the purposes of this statute of limitations includes constructive or

inquiry notice, as well as actual notice."  *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000).

Although it is clear that a plaintiff has a duty to inquire "when the circumstances would suggest to

an investor of ordinary intelligence the probability that she has been defrauded," whether the plaintiff

"had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to

dismiss."  *Lentell*, 396 F.3d at 168 (quotation marks omitted).  This is because inquiry notice can be

deemed clearly established, and thus, a complaint untimely, only when "the facts needed for

determination of when a reasonable investor of ordinary intelligence would have been aware of the

existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint."  *Id.*

(quotation marks omitted); *see also Rothman*, 220 F.3d at 98.

Defendants treat Plaintiffs' § 10(b) claim as time-barred, arguing that Plaintiffs "clearly knew

of the alleged 'fraud' in connection with the debt conversion as early as December 18, 2002, when

13

they objected to the debt conversion."  Harper Decl. [doc. # 48] Ex. 1 at 21 ("Defs.' Mem.").  By contrast, Plaintiffs contend that July 27, 2007 is the relevant date for purposes of the limitations period because it was the date on which they learned that Defendants completed the short-form merger at an inadequate price.  *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Second Am. Compl. [doc. # 50] at 25 [hereinafter Pls.' Opp'n].

During oral argument, the Court acknowledged the parties' respective positions on the limitations issues and observed that the fact-specific nature of that defense might preclude the Court from resolving it on a motion to dismiss.  Defendants expressed their willingness to have the Court reserve judgment on their limitations defense until, if necessary, a proper factual record is developed. Instead, Defendants asked the Court to focus on whether Plaintiffs have adequately alleged federal securities violations.  The Court agrees that it should reserve on the limitations issue.  Therefore, the Court expresses no view on the  limitations defense at this time.  Instead, the Court will turn to the adequacy of Plaintiffs' claim under § 10(b) and Rule 10b-5.[5]

## B.

At the outset, Defendants argue that Plaintiffs' Second Amended Complaint fails to allege both actionable fraud and scienter with the requisite particularity.  It is well-established that a plaintiff claiming a federal securities violation must plead fraud with particularity in accordance with

---

[5]  At oral argument, the Court invited the parties to file supplemental briefing on the following issues:  (1) whether Plaintiffs adequately plead causation; (2) whether statements of belief or opinion are actionable under federal securities law; and, (3) how "fraudulent scheme" allegations have been handled by the courts.  The parties later filed briefs addressing these three issues in greater detail.  *See* Pls.' Suppl. Mem. re Defs.' Mot. to Dismiss Second Am. Compl. [doc. # 67] [hereinafter Pls.' Suppl. Mem.]; Defs.' Suppl. Mem. of Law in Further Support of Defs.' Mot. to Dismiss Second Am. Compl. [doc. # 71] [hereinafter Defs.' Suppl. Mem.]; Pls.' Reply Suppl. Mem. re Defs.' Mot. to Dismiss Second Am. Compl. [doc. # 75] [hereinafter Pls.' Suppl. Reply].

Rule 9(b) of the *Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PLSRA"), 15 U.S.C. § 78u-4(b).  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,  551 U.S. 308, 127 S. Ct. 2499, 2504 (2007); *see also ATSI Commc'ns*, 493 F.3d at 99; *Chien v. Skystar Bio Pharm. Co.*, 566 F. Supp. 2d 108, 113-14 (D. Conn. 2008); *Collier v. Aksys Ltd.*, No. 3:04CV1232(MRK), 2005 WL 1949868, at *5 (D. Conn. Aug. 15, 2005).  In order to meet this heightened pleading standard, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak v. Kasaks* 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u-4(b)(1).

The Second Circuit has also made it clear that a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *ECA & Local 134*, 2009 WL 129911, at *4 (quoting 15 U.S.C. § 78u-4(b)(1), (2) and *Tellabs,* 127 S. Ct. at 2508).  This is so under the PSLRA and Rule 9(b) of the *Federal Rules of Civil Procedure.  See id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).  In an action brought under § 10(b) and Rule 10b-5, a plaintiff must therefore plead an intent to deceive, manipulate, or defraud.  *See id.* at *5 (citing *Tellabs*, 127 S. Ct. at 2504).  Recklessness can also suffice.  *See id.* (citing *Teamsters Local*, 531 F.3d at 194).  Under this heightened pleading standard, "the inference of scienter must be 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at *6 (quoting *Tellabs*, 127 S. Ct. at 2404-05); *see also ATSI Commc'ns*, 493 F.3d at 99.  Thus, the Court must weigh the inferences advocated by the Plaintiffs against any competing inferences supported by the facts alleged in the Second Amended Complaint. *See id.*  In making this

15

determination, the Court may consider (1) allegations that Defendants had the motive and opportunity to defraud Plaintiffs, or (2) strong circumstantial evidence of Defendants' conscious misbehavior or recklessness.  *See id.*; *see also Novak*, 216 F.3d at 307.

Defendants contend that neither of the two statements upon which Plaintiffs claim to have relied can properly be considered fraudulent misrepresentations of material fact.  The disputed statements, each contained in the 2002 Information Statement, are as follows:

> (1)  Given the prevailing economic conditions and our status as an early stage technology company, we do not believe that we have the ability to obtain third party financing on commercially reasonable terms, if at all; and

> (2)  If Liberty did not continue to provide funds to us, we would have been forced to cease operations immediately.

*See* Harper Decl. [doc. # 48] Ex. 1A.  According to Defendants, these statements are statements of opinion that are not actionable because they are neither objectively nor subjectively false.  *See* Defs.' Suppl. Mem. [doc. # 71] at 10-11.  Defendants also contend that Plaintiffs' claimed omission – namely, that Defendants omitted and concealed from Plaintiffs the true reason for the 2002 Interested Transaction, which was to perpetrate their fraud to divest the Plaintiffs of their interest in TruePosition – is not material.

Moreover, Defendants argue that Plaintiffs' allegations are merely an attempt to circumvent the Supreme Court's decision in *Santa Fe Industries v. Green*, 403 U.S. 462 (1977), by disguising a breach of fiduciary duty claim as a federal securities action.  *See* Mem. of Law in Support of Defs.' Mot. to Dismiss Pls.' Second Am. Compl. [doc. # 47] at 4-5 [hereinafter Defs.' Second Mem.]; Harper Decl. [doc. # 48] Ex. 1 at 12-13 ("Defs.' Mem.").  According to Defendants, Plaintiffs' real complaint is that Defendants failed to seek third-party financing, failed to obtain a fairness opinion

with respect to the 2002 Interested Transaction, failed to obtain a proper valuation, failed to allow the minority shareholder representative to share information about the company, failed to reduce TruePosition's indebtedness when allegedly able to do so, and failed in 2007 to have a legitimate business purpose for converting a nominal portion of the convertible stock into common stock. Each of these alleged failures are nothing more than garden variety breach of fiduciary duty or corporate waste claims, say Defendants, not securities law claims.

As to scienter, Defendants contend that Plaintiffs' allegations fail under either theory of scienter because the allegations do not support a strong inference that Defendants' 2002 Information Statement was intended to defraud Plaintiffs.  According to Defendants, Plaintiffs have failed to offer a "cogent and compelling" explanation for Defendants' conduct that counters the explanation set forth in the 2002 Information Statement, which is that the debt conversion was being undertaken in light of "prevailing economic conditions," TruePosition's "early stage" of development, and the fact that it had "always been contemplated that the funds represented by [Liberty Media's] inter-company accounts would serve as consideration for the issuance of securities senior to [TruePosition's] common stock." Harper Decl. [doc. # 48] Ex. 1A. Defendants argue that Plaintiffs' inability to present facts that support a strong inference that Defendants acted with the requisite scienter in 2002 is all the more apparent because Plaintiffs' votes were unnecessary for the debt conversion and Defendants thus had no motive to lie about the purpose of issuing preferred stock to Liberty Media.

Plaintiffs respond that their allegations amount to more than mere claims of mismanagement because Defendants "deceptively misstated the purpose for the [2002] Interested Transaction, misrepresented whether the Interested Transaction was necessary to prevent TruePosition from

having to cease its operations, and misrepresented their intent to use the equity conversion to enable

them to reach the 90% ownership threshold required to freeze Plaintiffs out at an unreasonably low

price."  Pls.' Opp'n [doc. # 50] at 13.  Plaintiffs also argue that Defendants' interpretation of *Santa*

*Fe* is too narrow and that actionable fraud includes "practices, acts, misstatements or omissions

designed to mislead investors."  *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192,

217 (S.D.N.Y. 2004).[6]

As to scienter, Plaintiffs say that they have met the heightened pleading requirements because

they offer strong circumstantial evidence of Defendants' conscious misbehavior or recklessness that,

taken collectively, gives rise to a strong inference of scienter.  *See Tellabs*, 127 S. Ct. at 2509 ("The

inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

(emphasis in original)).  Plaintiffs rely on events both before and after the 2002 Interested

Transaction:  Defendants' ability to secure KSI's wireless technology business at a massive discount

as a result of their position as the controlling shareholders; the self-serving nature of the 2002

Interested Transaction; the failure to seek out alternative financing; the failure to obtain a fairness

opinion; the lack of consideration for the recapitalization; the total disregard of the Minority

Shareholder Comments; the failure to reduce the debt upon an alleged increase in cash flow; and,

Defendants' alleged dubious accounting methodology.  As a result, Plaintiffs contend that they have

---

[6]  Plaintiffs argue that they have adequately alleged the subjective falsity of Defendants' statements – and in particular, Defendants' statement that commercially reasonable, alternate financing was unavailable – because Defendants never even attempted to secure alternate financing, and thus knew the statement was untrue when it was made.  *See* Pl.'s Suppl. Mem. [doc. # 67] at 13. Plaintiffs argue that the objective falsity of Defendants' statement is apparent from their allegations that Defendants failed to obtain a fairness opinion and never attempted to reduce their inter-company indebtedness or secure more favorable financing.  *See id.* at 14.

not only alleged that Defendants had an opportunity or motive to defraud Plaintiffs, but that Defendants' acted with conscious misbehavior or recklessness.

The Court has recounted the parties' arguments at length, because Defendants have raised substantial questions regarding the viability of Plaintiffs' § 10(b) and Rule 10b-5 claim.  In particular, though Plaintiffs seek to cast their claim in the clothing of securities fraud and misrepresentation, at base, their claim appears more akin to one of corporate mismanagement in which the essence of Plaintiffs' complaint is that they were treated unfairly by fiduciaries.  Ultimately, however, the Court has concluded that it need not address these substantial concerns, because even assuming – without deciding – that Plaintiffs have alleged actionable fraud with the requisite scienter, they must also allege transaction and loss causation.  The Court concludes that Plaintiffs have not done so adequately, despite having two opportunities to plead causation.

## C.

To make out a claim under § 10(b) or Rule 10b-5, a plaintiff must allege both transaction causation – "that the violations in question caused [Plaintiffs] to engage in the transaction in question" – and loss causation – "that the misrepresentations or omissions caused the [Plaintiffs'] economic harm."  *Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir. 2000) (quotation marks omitted); *see also Collier*, 2005 WL 1949868, at *5 (describing the transaction and loss causation requirements).  To avoid self-serving testimony and "claims based on hypothetical circumstances or speculation," a plaintiff is required to "present nonspeculative evidence of loss causation and transaction causation."  *Grace*, 228 F.3d at 48 (citing *Wilson v. Great American Industries, Inc.*, 979 F.2d 924, 931 (2d Cir. 1992)).

19

Furthermore, while the pleading of causation is governed by Rule 8 – not the heightened pleading requirements of Rule 9(b) or the PSLRA – a plaintiff nonetheless must allege enough to make his claim of causation plausible.  *See Dura Pharm. Inc.*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.");[7] *see also Stoneridge Inv. Partners*, 128 S. Ct. at 769 ("Reliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury.").  The Supreme Court recently sought to clarify the pleading requirements a complaint must meet in order to avoid dismissal in *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).  Although *Twombly* has raised "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings," *Iqbal v. Hasty*, 490 F.3d 143, 155 (2d Cir. 2007), *cert. granted by Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008), the Second Circuit has instructed that *Twombly* "requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render a claim *plausible*.'" *OBG Technical Servs., Inc.*, 503 F.2d at 502 (citing *Iqbal*, 490 F.3d at 157-58); *see also Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 225 (2d Cir. 2008) (same).

The Second Circuit has applied *Twombly* to claims brought under § 10(b) and Rule 10b-5, and has interpreted *Twombly* as requiring a plaintiff to "provide the grounds upon which his claim

---

[7] Defendants argue that given the heightened pleading requirements of the PSLRA, pleading causation should be subject to Rule 9(b)'s strictures and not Rule 8.  According to Defendants, the Supreme Court in *Dura Pharmaceuticals* left that question open.  *See In re eSpeed, Inc. Securities Litigation*, 457 F. Supp. 2d 266, 295 (S.D.N.Y. 2006).  The Court need not reach this issue because, as discussed below, Plaintiffs' pleading of causation fails under the more forgiving standard of Rule 8.

rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 127 S. Ct. at 1965); *see also Chapman v. New York State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (reaffirming the operative standard under *Twombly*).   As the Second Circuit recently stated, "a plaintiff's pleading obligation still 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (quoting *Twombly*, 127 S. Ct. at 1965).

1.      **Transaction Causation – Forfeiture of a State Law Remedy**

Courts generally have recognized that a plaintiff, without additional allegations, cannot plead or prove causation where the votes of controlling shareholders are legally sufficient to authorize a particular transaction or merger.   *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1106 (1991); *Wilson*, 979 F.2d at 929; *Grace*, 228 F.3d at 47.   The reason for this is that one can establish causation of damages by materially misleading statements by showing that the statements were an "essential link" in the accomplishment of the transaction.   *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).   And if the minority shareholders' votes were not necessary to approve a transaction, the defendants' statements could not be said to be an "essential link" in effectuating the transaction.   *See Virginia Bankshares*, 501 U.S. at 1102.

Nevertheless, even where the votes of controlling shareholders are sufficient to authorize a transaction, courts have recognized an alternative theory of causation that may nonetheless satisfy the transaction causation requirement.   This theory is founded on a minority shareholder's assertion that the defendant's fraud caused the shareholder to forfeit a state-law remedy that was otherwise available.   S*ee id.* at 1108 n.14; *Wilson*, 979 F.2d at 931 (in a § 14(a) case, holding that a minority

shareholder may show transaction causation by "the forfeiture of shareholders' appraisal rights").
Courts have explained that allowing causation to be founded on a theory of forfeited state-law
remedies generally will not "pose a threat of 'speculative claims and procedural intractability'"
because a plaintiff must show that the defendant's actionable fraud actually resulted in the plaintiff's
loss of any remedies available under state law.  *Wilson*, 979 F.2d at 932 (quoting *Virginia
Bankshares*, 501 U.S. at 1105).

Most cases proceeding under the lost state-remedy theory of causation have generally
examined a plaintiff's possible forfeiture of state-law appraisal rights as a result of a defendant's
misrepresentations.  *See, e.g.*, *Virginia Bankshares*, 501 U.S. at 1107; *Grace*, 228 F.3d at 49-50;
*Wilson*, 979 F.2d at 931; *Goldberg v. Meridor*, 567 F.2d 209, 219 (2d Cir. 1977).  However, courts
have also recognized that a plaintiff's forbearance from seeking injunctive relief to prevent the
corporate transaction might also satisfy the transaction causation requirement where the defendant's
fraudulent acts deceived the plaintiff into taking no action to stop a transaction.  *See Grace v.
Rosenstock*, 23 F. Supp. 2d 326, 332-33 (E.D.N.Y. 1998), *aff'd Grace*, 228 F.3d at 49-50; *accord
Madison Consultants v. FDIC*, 710 F.2d 57, 63 (2d Cir. 1983) (In accordance with *Santa Fe*,
"plaintiffs may prove the existence of a means of self-protection by showing that they could have
pursued some available state remedy if they had not been deceived."); *Goldberg*, 567 F.2d at 219
(with respect to materiality of a nondisclosure, stating that minority shareholders could have availed
themselves of injunctive relief under New York law given the nature of the parent-subsidiary
transaction and the unavailability of appraisal rights).

The Supreme Court first opened the door to the forfeited state remedy theory of transaction
causation in *Santa Fe*, *see* 430 U.S. at 474 n.14, and again noted its possibility in *Virginia*

*Bankshares*, *see* 501 U.S. 1108 n.14.   In *Virginia Bankshares*, the Supreme Court considered whether minority shareholders could demonstrate causation when their votes were unnecessary to authorize the corporate action that they alleged was materially misleading.  *See* 501 U.S. at 1087. The minority shareholders alleged that the board of directors had distributed misleading proxy statements that stated it had approved a merger plan because it would enable minority shareholders to receive a "high" or at least, "fair" price for their stock.  However, according to the plaintiffs in *Virginia Bankshares*, the board members had approved the proposal at an unfair price to the minority shareholders out of a desire to remain on the company's board.  *See id.* at 1088-89.  Because the plaintiffs' votes were not necessary for the transaction, and because the plaintiffs had actually voted against the merger, the Supreme Court was squarely presented with a question of transaction causation – namely, could the minority shareholders demonstrate causation when the defendants' need to obtain their authorization to approve the merger was plainly unnecessary.  *See id.* at 1099.

The Supreme Court rejected the minority shareholders' first theory of causation – that devoid of the misstatements and omissions, the defendants would have abandoned the merger plan out of fear of shareholder ill will and bad publicity – as inviting "speculative claims and procedural intractability."  *Id.* at 1101, 1105 (such a speculative causal connection would make liability "turn on 'hazy' issues [and invite] self-serving testimony, strike suits, and protracted discovery, with little chance of reasoned resolution by pretrial process").  Plaintiffs also advanced a second theory of causation – that the misleading proxy statement resulted in the loss of a remedy under state law.  *See id*. at 1106-07.  Specifically, plaintiffs argued that "causation can be recognized . . . when a minority shareholder has been induced by a misleading proxy statement to forfeit a state law right to an appraisal remedy by voting to approve a transaction" or when that shareholder "has been deterred

23

from obtaining an order enjoining a damaging transaction by a proxy solicitation that misrepresents the facts on which an injunction could properly have been issued." *Id.* at 1107.  The Supreme Court did not adopt plaintiffs' theories of causation because they had not pled any such loss in that case. *Id.* ("This case does not, however, require us to decide whether [the securities laws] provide a cause of action for lost state remedies, since there is no indication in the law or facts before us that the proxy solicitation resulted in any such loss.").  Nonetheless, the Court theorized that causation might be satisfied where an alleged statement misleads minority shareholders "into entertaining a false belief that they had no chance to upset the merger, until the time for bringing suit had run out," *id.* at 1108, or in cases where minority shareholders claim "any other application of a theory of lost state remedies," *id.* n.14.

The Second Circuit examined *Virginia Bankshares* just a little more than a year later in *Wilson v. Great American Indus., Inc.*, 979 F.2d 924 (2d Cir. 1992).  In *Wilson*, minority shareholders alleged that the corporation had solicited their votes for a proposed freeze-out merger under a materially misleading proxy statement. *See id.* at 926.  The plaintiffs advanced two theories of causation, the second of which asserted that the majority shareholders of the defendant corporation had "deceptively procured [their] vote in favor of the merger," which in turn, had "deprived them of their state appraisal rights." *Id.* at 930.  The Second Circuit posited that a minority shareholder who had lost his state appraisal rights on the basis of a deceptive proxy "may make 'a sufficient showing of a causal relationship between the violation and the injury for which he seeks redress'" because "[t]he deceptive proxy plainly constitutes an 'essential link' in accomplishing the forfeiture of this state right." *Id.* at 931 (quoting *Mills*, 396 U.S. at 385).

*Wilson* also recognized that the minority shareholders' forfeiture of their state appraisal rights may also establish loss causation where "a proxy statement prompts a shareholder to accept an unfair exchange ratio for his share rather than recoup a greater value through a state appraisal." *Id.* The court further stated that "transaction causation may be shown when a proxy statement, because of material misrepresentations, causes a shareholder to forfeit his appraisal rights by voting in favor of the proposed corporate merger." *Id.* Noting that the minority shareholders must actually show that they lost their state appraisal rights, the Second Circuit remanded for a determination of whether the plaintiffs actually lost any remedies available to them under state law. *See id.* at 932 (citing *Virginia Bankshares*, 501 U.S. at 1108 n.14).

The Second Circuit returned to transaction causation, this time on a § 10(b) and Rule 10b-5 claim, in *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000). There, the minority shareholders complained that, in connection with a proposed merger for which the minority shareholders' votes were unnecessary, the defendants issued a misleading proxy statement that made material misrepresentations and omissions including, among others, false representations regarding the reason for the merger and omissions that the merger was part of a scheme to divert the corporation's assets to its controlling shareholders for their personal gain. *See id.* at 42-43. The plaintiffs' amended complaint sought rescission or reformation of the merger. *See id.* After a bench trial, the district court dismissed all claims in their entirety as to the last remaining defendant. *See id.* at 44. Even though the district court assumed *arguendo* that the plaintiffs had proved a material misrepresentation or omission, the court held that their claim failed because they did not establish transaction causation. *See id.* The district court found that the plaintiffs had not voted for the

25

transaction and thus, had retained their right to an appraisal action, which was their exclusive remedy under state law for undervalued shares. *See id.*

On appeal, the Second Circuit likewise concluded that the minority shareholders had failed to satisfy the transaction causation element of their § 10(b) and Rule 10b-5 claim.  The Second Circuit distinguished the facts in *Grace* from those in *Vine v. Beneficial Finance Co.*, 374 F.3d 627 (2d Cir. 1967), a pre-*Virginia Bankshares* case upon which the plaintiffs relied.[8]  The *Grace* court noted that in *Vine*, it had held that a Class A shareholder satisfactorily pleaded reliance and causation in alleging a two-phase scheme through which the defendant corporation had (1) obtained the requisite percentage of shares necessary to accomplish a freeze-out merger by fraudulently inducing certain Class A shareholders to tender their shares to it, and (2) later eliminated the plaintiff and other remaining Class A shareholders.  *See id.* at 49.  Although the plaintiff in *Vine* had not sold his shares to the defendant corporation during the time that it was shoring up the requisite percentage for its later short form merger, other Class A shareholders had relied on the defendant's fraudulent conduct during this time, and as a result, had sold their shares.

The Second Circuit in *Vine* had stated that the defendant's argument that the alleged deception "did not relate to Vine, who did not sell at th[e] time [the initial offer was tendered] . . . ignores the simple fact that [he] would never be in the position of a forced seller were it not for the fraud."  *Vine*, 374 F.2d at 635.  Thus, the plaintiff in *Vine* was not circumventing the causation requirement by failing to establish *his* reliance on the claimed deception; rather, the plaintiff's allegations demonstrated that "'there was deception which misled Class A stockholders and that this

---

[8]  The decision and rationale in *Vine* has been criticized as having been superceded by later decisions.  *See Isquith by Isquith v. Caremark Intern., Inc.*, 136 F.3d 531, 535-36 (7th Cir. 1998).

was in fact the cause of plaintiff's claimed injury.'" *Grace*, 228 F.3d at 49 (quoting *Vine*, 374 F.3d

at 635).  Conversely, the Second Circuit concluded in *Grace* that the plaintiffs' allegations contained

"no suggestion" that the defendants had obtained their controlling position by fraudulent conduct.

*Id.*  As the Second Circuit stated, "[n]o vote, sale of shares, or other action was required of minority

shareholders in order to accomplish the merger."  *Id.*  Thus, the court held that unlike the plaintiff

in *Vine*, the plaintiffs in *Grace* could not show causation on the basis of the merger because they

were wholly unnecessary for its approval.  *See id.*

      The Second Circuit in *Grace* then addressed whether the plaintiffs could satisfy the

requirement of transaction causation on the basis of their alleged forfeiture of a state-law remedy.

The plaintiffs argued that although they did not vote for the freeze-out merger, their reliance on

defendants' proxy statement caused them to forfeit their state-law claim for "rescissory damages."

*See id.* at 50.  The Second Circuit rejected the plaintiffs' argument for several reasons: first, state law

mandated that an appraisal action was the plaintiffs' exclusive remedy for damages; second, the

defendants "lawfully owned sufficient shares to approve the merger and freeze out other shareholders

without the approval of any minority shares"; third, the plaintiffs' lack of appraisal rights was the

result of their stipulation in the federal action, not the result of any sort of reliance; and finally, the

plaintiffs failed to cite any law or authority that supported their argument that they forfeited a state

remedy in reliance of the defendants' proxy statement.  *Id.* at 50.  Having rejected the plaintiffs'

causation theories, the Second Circuit affirmed the district court's dismissal of the plaintiffs' § 10(b)

and Rule 10b-5 claim for their failure to show transaction causation.  *See id.*

      With these principles in mind, the Court now turns to Plaintiffs' Second Amended Complaint

and its allegations of transaction causation.

2.       **Plaintiffs' Allegations of Forbearance**

The district court in *Grace* described what plaintiffs must allege and prove to establish transaction causation under a forfeiture of state-law remedies theory:

> [E]ven if the remedy of seeking an injunction were available, to establish causation under this theory, plaintiffs must do more than simply assert that they would have sought to enjoin a transaction under state law if certain relevant information had been disclosed.  They must show by a fair preponderance of the evidence that they would have *succeeded* in preventing the loss they sustained. . . . [In this case], Plaintiffs have not even asserted a theory under which they might have been entitled to injunctive relief under state law, let alone attempted to meet their burden of demonstrating that such a claim would have been successful, and this court will not carry that burden for them.

*Grace*, 23 F. Supp. 2d at 334 (internal citations omitted) (emphasis in original).  The district court's reasoning accords with Second Circuit precedent.

For the Second Circuit has held that "[i]n order to establish that defendants' alleged misrepresentation caused them loss, plaintiffs must show by a preponderance of the evidence that they believed the misrepresentation, that they relied on it in not pursuing available methods of self-protection, and that they would have succeeded if they had been advised of the truth and had pursued such remedies." *Madison Consultants*, 710 F.2d at 64; *see also Grace*, 228 F.3d at 50 ("[P]laintiffs have cited no New York law, or any other relevant authority, for the proposition that there was any available state-law remedy that they forfeited in reliance on the [corporation's] proxy statement.").  Such a showing is necessary to avoid "a presumption of causation" in cases where a plaintiff "is not master of his own means of self-protection [because] he must enlist the aid of courts . . . to attempt to prevent injury to himself, and he may or may not succeed." *Madison Consultants*, 710 F.2d at 65 & 65 n.6.  As the Second Circuit noted in *Madison Consultants*, "even if the plaintiff in such a case

28

*relied* by not pursuing some indirect means of self-protection, that reliance may not be the *cause* of

his injury if the means of self-protection would have failed." *Id.* at 65.

Of course, *Grace* arose following a trial rather than at the pleading stage.  Therefore,

Plaintiffs need not *establish* transaction causation at the pleading stage.  Nevertheless, Plaintiffs must

allege enough to state a claim for transaction causation that is "plausible on its face." *Twombly*, 127

S. Ct. at 1974.

Plaintiffs' 26-page, 111-paragraph Second Amended Complaint devotes a single paragraph

to alleging how Defendants' misrepresentations and failure to disclose the true purpose of the 2002

Interested Transaction caused their injuries.  That allegation is, in its entirety, as follows:

> As a result of Defendants' misrepresentations and omissions related to the [2002]
> Interested Transaction, and in reliance upon them, the Stockholders also forebore
> injunctive and other remedies to either prohibit the Interested Transaction or vitiate
> it, either through a derivative action or by other state remedies available to them.
> Such relief would have both limited the harm caused by the freeze out as well as
> increased the value of TruePosition which would have, in turn, increased the value
> of the Stockholders['] shares.

*See* Second Am. Compl. [doc. # 42] ¶ 28.  This paragraph does not identify the  "misrepresentations

and omissions related to the [2002] Interested Transaction" upon which Plaintiffs relied in foregoing

the "injunctive and other remedies" available to them, though at oral argument, Plaintiffs stated that

they relied on the two statements in the 2002 Information Statement, and the corresponding failure

to disclose the true purpose of the 2002 transaction, as the Court  has previously noted.  *See supra*

at 16.  Furthermore, although Plaintiffs cite Defendants' post-2002 actions as circumstantial evidence

of a fraudulent scheme,[9] at oral argument Plaintiffs represented to the Court that they were relying

---

[9]  Plaintiffs also allege that from 2004 onwards, "Defendants failed to reasonably disclose
the nature or amount of indebtedness and interest that was continually growing and compounding
and . . . the resultant diminution of the Stockholders' representative ownership in the case of a

only on Defendants' misrepresentations and omissions in 2002 with respect to actionable fraud and were not alleging that Defendants made further actionable statements or omissions other than those made in connection with the 2002 Interested Transaction.[10]

The Court has little difficulty concluding that this lone, highly conclusory and formulaic paragraph of Plaintiffs' Second Amended Complaint is not sufficient to plead transaction causation with any semblance of plausibility.  The Court says this for several reasons.  First, as Plaintiffs acknowledge, their votes were not necessary to approve the 2002 Interested Transaction.  *See Virginia Bankshares*, 501 U.S. at 1102, 1105.

Second, Plaintiffs voted against the transaction. It is undisputed that they opposed the transaction on numerous grounds, including the following:

(1) The terms of the transaction were not fair or commercially reasonable and were based upon an improper and defective valuation;

(2) Defendants had not adequately investigated alternatives, including third-party financing, or obtained an independent third-party fairness opinion precisely because of the conflicted interest of Liberty Media in the transaction;

(3) TruePosition was not receiving any new consideration or value from the transaction; and

(4) The Board of Directors of TruePosition was conflicted and interested in the transaction, had not acted in the interests of the minority shareholders, and could not therefore properly approve of the transaction.

---

conversion." *See* Second Am. Compl. [doc. # 42] ¶ 32.  According to Plaintiffs, this "failure to reasonably advise the Stockholders of the actual effect of the continued debt and interest accrual on the Stockholders' ownership interest further concealed Defendants' scheme and deprived the stockholders of a reasonable opportunity to exercise any other remedies." *Id.*

[10]  Of course, if Plaintiffs were alleging further material misrepresentations or omissions beyond those they attribute to Defendants in 2002, those allegations would have to be plead with particularity. *See supra* Pt. II.B.; *ATSI Commc'ns, Inc.*, 493 F.3d at 99.

*See* Harper Decl. [doc. # 48] Ex. 3; *see* Second Am. Compl. [doc. # 42] ¶ 24 ("Defendants made absolutely no effort to seek out any independent or alternative financing,"); *id.* ("Defendants failed to obtain a fairness opinion for the anticipated Interested Transaction, notwithstanding the fact that the Interested Transaction involved substantial benefit to Liberty Media for no consideration, was self serving, and was approved by a board comprised of Liberty Media insiders"); *id.* ¶ 26 ("Defendants obtained a valuation for the purpose of arriving at an improper rate for conversion to equity.").

Plaintiffs' written objection to the transaction further stated that "[i]n particular, objection is made on the grounds that the subject transaction does not appear to be in the best interests of all of the shareholders of [TruePosition], and, in particular, appears to have a detrimental and clearly injurious effect on the interests of the Minority Shareholders." *See* Harper Decl. [doc. # 48] Ex. 3. Plaintiffs even went so far as to assert that the failure of the Board of Directors of TruePosition to disapprove of any such transaction "may be violative of its fiduciary duties to the shareholders of the Corporation." *Id.* As Plaintiffs' counsel acknowledged at oral argument, Plaintiffs knew all of this in 2002. *See* Defs.' Suppl. Mem. [doc. # 71] Ex. 1 at 30:19-25; 31:4-7 ("Transcript of Oral Argument dated July 9, 2008").

Third and furthermore, at oral argument, Plaintiffs acknowledged that the 2002 Information Statement contained a dilution analysis, and that, therefore, Plaintiffs knew in 2002 that they were in a position to be diluted to under ten percent. In addition, as a consequence of the proposed recapitalization, Plaintiffs knew that Liberty Media would be in a position to effectuate a short-form merger without Plaintiffs' approval. *See id.* at 33:14-23. The colloquy with Plaintiffs' counsel was as follows:

> COURT:  Mr. Finn, I want a direct answer to my questions.  Your clients knew in 2002, as a result of the recapitalization, which they voted against going forward, that Liberty Media was in a position, by way of this convertible debt, such that if they converted it at some point in the future, your clients would be diluted down below 10 percent, which would allow Liberty Media to effectuate a freeze-out merger.  Your clients knew that in 2002, did they not?
>
> COUNSEL:  Yes.

*Id.*

Therefore, in these circumstances, it is difficult in the extreme to understand how alleged misrepresentations in 2002 "deceived" Plaintiffs into forfeiting the alleged right to seek to enjoin a transaction that Plaintiffs at the time knew, believed, and said was improper, a breach of the Board of Directors' fiduciary duties, contrary to the minority shareholders' interests, and had the potential to lead to a dilution of their interests in the company and a freeze-out merger.  And of course, the lone paragraph of the Second Amended Complaint offers no clue to that mystery, even though the facts necessary to make a forfeiture of state remedies theory plausible are entirely in the possession of Plaintiffs, not Defendants.  *See Twombly*, 127 S. Ct. at 1965 ("Factual allegations must be enough to raise a right above the speculative level.");  *OBG Tech. Servs., Inc.*, 503 F. Supp. 2d at 508-509.

This omission is particularly glaring, since unlike all of the other cases in which plaintiffs have been permitted to pursue a forfeiture of state law theory of causation, Plaintiffs in this case were well aware that Defendants were conflicted and interested, that they did not conduct the kind of analysis that would support a disinterested transaction, and that the 2002 transaction was contrary to Plaintiffs' interests as minority shareholders.  While it is not in their Second Amended Complaint, Plaintiffs at oral argument acknowledged that in 2002 they held a meeting to determine whether to

32

bring a derivative action challenging the 2002 Interested Transaction.  *See* Defs.' Suppl. Mem. [doc. # 71] Ex. 1 at 26:16-22.  Apparently, Plaintiffs chose not do so.

Yet, in their Second Amended Complaint, Plaintiffs do not say why they decided not to pursue state-court litigation to prevent the 2002 Interested Transaction.  Indeed, despite two attempts to amend their complaint and a specific attack by Defendants in their original motion to dismiss regarding Plaintiffs' allegation of transaction causation, *see* Harper Decl. [doc. # 48] Ex. 1 at 16-18 ("Defs.' Mem."), Plaintiffs fail to offer anything more than a conclusory, one-paragraph allegation that for some as yet unexplained reason, Defendants' actions in 2002 stymied Plaintiffs' ability to avail themselves of a means of self-protection.  In these circumstances, conclusory words that merely parrot forfeiture of state remedies language are insufficient.  *See Twombly*, 127 S. Ct. at 1965; *Burch*, 551 F.3d at 124; *OBG Tech. Servs., Inc.*, 503 F. Supp. 2d at 508, 510.

Plaintiffs invoke *Vine* in support of their argument that they have adequately plead transaction causation, but that case is not applicable to the facts of this case.  As the Court has previously stated, the Second Circuit held that the plaintiff in *Vine* had adequately demonstrated reliance and causation because he had alleged that the defendant had induced a sufficient number of his fellow Class A shareholders to tender their shares to it, and as a result, had secured the requisite percentage of ownership to later effectuate a freeze-out merger of the plaintiff and other remaining Class A shareholders at an inadequate price.  However, unlike in *Vine*, Defendants in this case needed no aid from Plaintiffs to move ahead with the 2002 Interested Transaction.  Thus, just as in *Grace*, no prior "vote, sale of shares, or other action was required of minority shareholders in order to accomplish the merger."  228 F.3d at 49.  Plaintiffs' objection to the 2002 Interested Transaction and Defendants' ability to approve it plainly illustrates as much.  Thus, just as the

33

Second Circuit in *Grace* distinguished *Vine* based on a lack of any necessary authorization on the part of the minority shareholders for the defendant to succeed in its proposed action, so too are the facts of this case distinguishable from *Vine*.

At oral argument, Plaintiffs argued – though it is not plead – that they needed the short-form merger to occur in 2007 before they were able finally to discern Defendants' true scheme. But the issue here is whether Defendants' fraudulent conduct in 2002 caused Plaintiffs to forego injunctive relief to prevent the 2002 Interested Transaction. While Plaintiffs may not have known Defendants alleged "true intentions," Plaintiffs knew more than enough to support an action to enjoin the 2002 Interested Transaction.

Indeed, in their supplemental brief, Plaintiffs acknowledge that they could have succeeded in obtaining injunctive relief on the facts known to them in 2002 on the basis of the apparent, self-interested nature of the proposed transaction. *See* Pls.' Suppl. Mem. [doc. # 67] at 8-9 ("[T]he Delaware Supreme Court has recognized that any interested transaction in which a controlling shareholder receives stock with the effect of diluting the voting power and economic value of the minority shares is a breach of fiduciary duty"); *see generally Gentile v. Rossette*, 906 A.2d 91 (Del. 2006); *Gatz v. Ponsoldt*, 925 A.2d 1265 (Del. 2007). Plaintiffs' forfeiture claim is all the more implausible because Plaintiffs (1) fail to allege how this last remaining piece of information was integral to their seeking state court relief despite the abundance of information known to Plaintiffs in 2002 about what they described as an interested, gratuitous, and self-serving transaction, and (2) fail to allege that they would have succeeded in obtaining such relief if only they had that particular piece of information. *See Grace*, 228 F.3d at 50; *Madison Consultants*, 710 F.2d at 62.

34

In response to persistent questioning about transaction causation, Plaintiffs' counsel at argument contended that this lawsuit "is not about the terms of the [2002] interested transaction." Defs.' Suppl. Mem. [doc. # 71] Ex. 1 at 31:8-9.  What makes that statement utterly perplexing, however, is that Plaintiffs' theory of transaction causation is *all* about the 2002 Interested Transaction and the alleged state-law remedies that they supposedly forfeited. Yet, Plaintiffs never explain – in their complaint, pleadings, or at oral argument – how Defendants' alleged fraudulent statements caused them to forfeit state remedies regarding the 2002 Interested Transaction.

Apparently, Plaintiffs considered bringing a state-court action in 2002 but chose not to do so for a reason Plaintiffs decline to disclose.  Plaintiffs now seek relief in this Court as a result of their dissatisfaction five years later with the choice they made in 2002.  However, without further facts or allegations, Plaintiffs' claim that they relied on "Defendants' misrepresentations and omissions related to the Interested Transaction" and as a result, "forebore injunctive and other remedies to either prohibit . . . or vitiate it," is simply not plausible.  *See Grace*, 23 F. Supp. 2d at 334 ("Plaintiffs have not even asserted a theory under which they might have been entitled to injunctive relief under state law, let alone attempted to meet their burden of demonstrating that such a claim would have been successful, and this court will not carry that burden for them."), *aff'd Grace*, 228 F.3d 40.  To use the Supreme Court's words from *Virginia Bankshares*, Plaintiffs' claim fails to demonstrate "that the [2002 Information Statement] statement misled [Plaintiffs] into entering a false belief that they had *no chance* to upset the merger, until the time for bringing suit had run out." 501 U.S. at 1108 (emphasis added).  Even when accepting all of Plaintiffs' allegations as true for purposes of the motion to dismiss, Plaintiffs have not made a plausible claim that Defendants "deterred [them] from obtaining an order enjoining a damaging transaction by a proxy solicitation

35

that misrepresented the facts on which an injunction could properly have been issued." *Id.* at 1107. Accordingly, Plaintiffs have not alleged transaction causation.

### 3.     Loss Causation

Plaintiffs' allegations of loss causation are equally as problematic as their transaction causation allegation.   Loss causation is "the proximate link between the alleged misconduct and the plaintiff's economic harm," and requires a plaintiff to "plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *ATSI Commc'ns*, 493 F.3d at 106 (citing *Lentell*, 396 F.3d at 173); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  As the Supreme Court has noted, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc.*, 544 U.S. at 347; *see also* 15 U.S.C. § 78u-4(b)(4) (placing the burden of proof for loss causation on the plaintiff).   In addition, a plaintiff cannot rely on a "paraphrased allegation of transaction causation" to satisfy its burden of showing "the relationship between the fraud and the loss of the investment." *Lentell*, 396 F.3d at 174; *ATSI Commc'ns*, 493 F.3d at 107.  Thus, Plaintiffs' allegations need to, at a minimum, demonstrate that Defendants' actions in 2002 proximately caused the loss in their investment value.

Here, Plaintiffs argue that Defendants' failure to disclose the true purpose of the 2002 Interested Transaction caused the Plaintiffs' loss because it impeded them from seeking injunctive relief, and thus enabled Defendants to complete the transaction that would later allow them to secure the ninety-percent (90%) ownership necessary to effectuate the short form merger that divested Plaintiffs of their equity interest in TruePosition at an inadequate price.  However, Plaintiffs include

36

only conclusory allegations of loss causation.  *See* Second Am. Compl. [doc. # 42] ¶ 28 ("Such [injunctive] relief would have both limited the harm caused by the freeze out as well as increased the value of TruePosition which would have, in turn, increased the value of the Stockholders shares."); *see  also* ¶ 38 ("The gratuitous transaction, which gave Liberty Media a secured, senior position, convertible interest in a preexisting debt for no additional consideration, was part of Defendants' overall and ongoing fraudulent scheme by which they conspired to procure the requisite number of shares to ultimately effectuate the freeze out merger and divest the Stockholders of their interest in TruePosition."); ¶ 47 ("Defendants' wrongful and fraudulent conduct in perpetrating the long standing fraudulent scheme to divest the Stockholders of their interest in TruePosition directly and proximately caused the economic loss suffered by the Shareholders.").

Plaintiffs must allege in non-conclusory terms that enforcement of their state-law rights would have increased the value of their shares.  *See Burch*, 551 F.3d at 124 (quoting *Twombly*, 127 S. Ct. at 1965); *Madison Consultants*, 710 F.2d at 62-63; *see also Dura Pharm., Inc.*, 544 U.S. at 346-47.  According to Plaintiffs, had they only moved to obtain injunctive relief in 2002, they would have thwarted a short-form merger five years later that valued their shares at $ 3.51 per share as opposed to the $ 19 per share that their stock was worth at the time TruePosition acquired KSI in mid-2000.  However, in the particular factual circumstances of this case, Plaintiffs' allegations of loss causation are inadequate to support their conclusory assertion that Defendants' misrepresentations or omissions in 2002 were the proximate cause of the reduced value of their shares five years later, in 2007.  *See Lentell*, 396 F.3d at 176 ("It is further alleged that plaintiffs were injured 'because the risks that materialized were risks of which they were unaware as a result of Defendants' scheme to

defraud,' and that they would not have been injured absent the scheme.  But that is a legal conclusion; missing are the necessary allegations of fact to support the conclusion.").

As the Second Circuit has specifically stated with respect to loss causation, "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, . . . a fraud claim will not lie." *Id.* at 174 (quotation marks and citations omitted); *accord Isquith*, 136 F.3d at 536 ("The plaintiff [in *Vine*, a pre-*Santa Fe* case] claimed that the defendant had by means of fraud obtained the shares of enough other shareholders to be in a position to squeeze him out, to his injury.  But that injury strikes us as too remote from the fraud to be actionable in a suit under the securities law. . . . The misrepresentations in *Vine* were not directed at Vine and did not induce *him* to do anything; it made him vulnerable to a completely different kind of fraud – the abuse of minority shareholders by means of squeeze-outs, a form of fraud that the federal securities laws do not reach.").  In this case, Plaintiffs fail to support their conclusory allegation that they relied on Defendants' 2002 actions, and thus cannot utilize that same claim to bolster their allegation that such reliance proximately caused their decreased stock value five years later.  Moreover, Plaintiffs do not consider any changes in economic circumstances or industry-specific trends that might account for some portion of TruePosition's reduced stock value.  *See Dura Pharm., Inc.*, 544 U.S. at 342-43.  In this case, Plaintiffs have failed adequately to allege either transaction or loss causation, and their § 10b and Rule 10b-5 claim thus fails.  The Court dismisses Count One of the Second Amended Complaint.

### 4.     Leave to Amend

As this Court discussed in *Collier*, it is "'often appropriate for a district court, when granting a motion to dismiss . . . to give the plaintiff leave to file an amended complaint.'"  2005 WL

1949868, at *18 (quoting *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 91 (2d Cir.2003));
*see Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 276 (2d Cir.1998) ("Plaintiffs whose
complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their
complaint.").  "Although leave to replead is within the discretion of the district court, refusal to grant
it without any justifying reason is an abuse of discretion." *Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42, 48 (2d Cir.1991).

Here, however, the Court has already given Plaintiffs a chance to replead in response to
Defendants' original motion to dismiss, which raised the same arguments regarding the inadequacy
of Plaintiffs' claims of transaction and loss causation.   Since Plaintiffs have already had an
opportunity to replead and since they did not take advantage of that opportunity, the Court sees no
reason to provide yet a third chance to plead causation.   *See Burch*, 551 F.3d at 126 ("[M]otions to
amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive,
repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the
non-moving party." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *Port Dock & Stone Corp.*,
507 F.3d at 127 (denying leave to replead where plaintiff failed to show any pleading to cure the
deficiencies in the complaint); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007)
(affirming district court's denial of leave to file a third amended complaint where plaintiffs had two
previous opportunities to amend); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 n.4 (2d Cir. 1998)
(denying leave to replead because "the district court already gave [plaintiff] an opportunity to file
an amended complaint designed to cure the very defect that remains").   In fact, Plaintiffs have not
even asked for such an opportunity.

**D.**

Plaintiffs also assert a control person liability claim under § 20(a) of the Exchange Act, which provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "[T]o establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108 (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 2006)).  Having found that Plaintiffs failed to state a primary violation under § 10(b) and Rule 10b-5, Plaintiffs' control person liability claim must also fail.  *See ECA & Local 134*, 2009 WL 129911, at *13; *ATSI Commc'ns*, 493 F.3d at 108.  Thus, the Court dismisses Count Two of the Second Amended Complaint.

### III.  State Law Claims

Counts Three through Seven of Plaintiffs' Second Amended Complaint allege violations of the Connecticut Uniform Securities Act, Conn. Gen. Stat. §§ 36b-4 and 36b-29, as well as breach of fiduciary duty, fraud, conspiracy to defraud, and unjust enrichment.  However, after dismissing all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if – (1) the claim raises a novel or complex issue of State

law, . . . [or], (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."). As this Court has previously stated, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Hernandez v. Carbone*, 567 F. Supp. 2d 320, 333-34 (D. Conn. 2008) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)). Because this Court has dismissed all claims over which it has original jurisdiction, this is the usual case, and therefore, this Court should not retain jurisdiction merely to decide claims that arise wholly under state law. Accordingly, the Court dismisses, without prejudice to renewal, Counts Three through Seven of Plaintiffs' Second Amended Complaint.

## IV.  Conclusion

The Court GRANTS Defendants' Motion to Dismiss the Second Amended Complaint [doc. # 46]. All federal claims are dismissed with prejudice. All state law claims are dismissed without prejudice to renewal in state court. **The Clerk is directed to enter judgment in accordance with this decision and to close this file.**

IT IS SO ORDERED,


/s/ _____Mark R. Kravitz_____
                United States District Judge


**Dated at New Haven, Connecticut: February 12, 2009.**

41